UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TAMMY STATEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:20-CV-00768-CLS** |
| | ) | |
| **RON W. PUCKETT, in his official** | ) | |
| **capacity as Sheriff of Morgan** | ) | |
| **County, Alabama,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff, Tammy Staten, was employed as a "Detention Deputy" in the Morgan

County, Alabama, Jail for slightly more than a year, from June 27, 2015 through June

29, 2016.[1]   Ana Franklin then was the Sheriff of Morgan County.  Franklin was

replaced on January 15, 2019, by the defendant and incumbent Sheriff, Ron W.

Puckett.  Plaintiff commenced this action by filing a *pro se* complaint alleging that

the "Morgan County Sheriffs Department" had discriminated against her based upon

---

[1] Plaintiff's job title is inconsistently referred to in the record as "Detention Officer," "Detention Deputy," or "Corrections Officer."  *See* doc. no. 57-1 (Plaintiff's Deposition), at 15 ("Detention Officer"); *id.* at ECF 81 (County Commission Personnel Action Request generated when plaintiff was hired, and referring to the position as "Detention Deputy"); *id.* at ECF 86-88 (title of "Corrections Officer" appears on the "Morgan County, Alabama Classification Specification," and listing the essential functions of that position as it related to the Morgan County Jail).  This opinion uses the term "Detention Deputy."  **NOTE**:  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically:  *i.e.*, "Electronic Case Filing."  Whenever the court cites to pagination generated by the ECF header, it will precede the page number(s) with the letters "ECF."

her "disability or perceived disability"[2] through "Non-compliance of Disability Rights and Equality to all.  Was Retaliated against and Terminated in fraudulent manner."[3] Two *pro se* amendments restated her complaint as "Discrimination and retaliation w/ termination of employment."[4]  Plaintiff eventually retained counsel, and her attorney filed a third amended complaint naming Sheriff Puckett as defendant, and alleging claims based upon the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. ("ADA"), § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").[5]  Defendant's motion to dismiss that pleading was granted with respect to plaintiff's Rehabilitation Act claim, but denied in all other respects.[6]  Plaintiff also was granted leave to file a fourth amended complaint.[7]  This opinion addresses defendant's motion for summary judgment on the claims alleged in that pleading.[8]

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[2] Doc. no. 1 (Complaint), § III.D, at 5.

[3] *Id*., § III.E, at 5.

[4] Doc. no. 5 (First Amended *Pro Se* Complaint), § III.E, at 5; doc. no. 7 (Second Amended *Pro Se* Complaint), § III.E, at 5.

[5] Doc. no. 11 (Third Amended Complaint).

[6] *See* doc. no. 31 (Memorandum Opinion and Order), at 9-10.

[7] *Id.*; *see also* doc. no. 34 (Fourth Amended Complaint).

[8] Doc. no.  55 (Motion for Summary Judgment).

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In

other words, summary judgment is proper, "after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman*

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.*

*City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-

moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

only a guess or a possibility, for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration

supplied).

# I.  FACTS

Plaintiff experienced chest pains while working in the Morgan County Jail on June 7, 2016.[9]  She was admitted to the Decatur-Morgan County Hospital through its Emergency Room and diagnosed with a pulmonary embolism.[10]  She was discharged two days later, and examined on June 22, 2016 by Dr. Kathleen Dupper, who prescribed a regime of "Xarelto":  an anti-coagulant medication commonly used to prevent the formation of blood clots.[11]

Plaintiff attempted to return to work on June 29, 2016.  She gave her immediate supervisor, Sergeant Richard Moats, a copy of the work restrictions prescribed by Dr. Dupper:  *i.e.*, "Patient with medical condition which places her at increased risk of bleeding.  [Patient] is not permitted to be around inmates x 6 months and must remain on light duty for 6 months."[12]

Moats assigned plaintiff to the Jail's Master Control post, an area that inmates were not permitted to enter,[13] and one around which there was not much inmate

---

[9] Doc. no. 57-1 (Plaintiff's Deposition), at 27-30.

[10] *Id*., Exhibit 2, at ECF 82-83.

[11] Doc. no. 62-10 (Dr. Dupper Deposition), at 24-26.  Dr. Dupper testified that six months of treatment with Xarelto is the usual course for a pulmonary embolism.  *Id.* at 29.

[12] Doc. no. 57-1 (Plaintiff's Deposition), Exhibit 4, at ECF 85 (alteration supplied).

[13] Doc. no. 57-1 (Plaintiff's Deposition), at 47; *see also* doc. no. 62-1 (Morgan County Detention Facility Policies and Procedures, Master Control Post Order).

movement.[14]   Later that morning, Moats notified his supervisor (and the Jail's

administrator), Captain Larry Berzett, that plaintiff had been restricted by her

physician from interacting with inmates for six months, and to light duty.[15]  Berzett

instructed Moats to accompany plaintiff to the office of Charlene Sullivan, the

Sheriff's Administrative Supervisor.[16]

Captain Berzett believed plaintiff could not perform the duties of a Detention

Deputy due to her physician's restriction of "no contact with inmates."[17]  Moreover,

during Ana Franklin's term as Morgan County Sheriff, she had implemented a

standing policy prohibiting Detention Deputies from working in the Jail while subject

to restrictions imposed by a physician.[18]  That policy was rescinded by defendant Ron

Puckett when he became Sheriff, thereby allowing Jail employees with certain

physician-imposed restrictions to perform light duty assignments.[19]  Also by that date,

an "annex" had been added to the Jail, which allowed greater flexibility in employee

assignments.[20]   Those changes did not benefit plaintiff, however, because her

---

[14] Doc. no. 57-2 (Lieutenant Moats Deposition), at 30.

[15] *Id.* at 34-35.

[16] *Id.* at 35.

[17] Doc. no. 57-3 (Captain Berzett Deposition), at 154-55.

[18] *See* doc. no. 57-12 (Larry Berzett Declaration), ¶ 16; doc. no. 57-3 (Captain Berzett Deposition), at 71-72.  A written copy of the policy is not in the record.

[19] Doc. no. 57-8 (Sheriff Puckett Declaration), ¶ 13.

[20] Doc. no. 62-6 (Warden Dawson Deposition), at 81-82.

employment ended on June 29, 2016, following her meeting with Captain Berzett,

Sergeant Moats, and Administrative Supervisor Sullivan.  The details of that meeting

are disputed.

Defendant contends that Captain Berzett told plaintiff that she could either

resign her employment and apply for unemployment benefits, or she could apply for

leave under the Family and Medical Leave Act, which would have covered twelve

weeks of her six-month medical restriction (with the possibility that she could be

terminated at the end of that period if her medical restriction had not been lifted).[21]

Defendant also contends that Captain Berzett told plaintiff that, if she chose to resign,

he would direct Ms. Sullivan to prepare a letter that plaintiff could use to pursue

unemployment benefits,[22] and that he would re-hire her when her medical restrictions

were lifted.[23]

Plaintiff's account of Captain Berzett's statements is different.  She contends

that he gave her the choice of resignation or termination.[24]  She testified that she

---

[21] Doc. no. 57-3 (Captain Berzett Deposition), at 159-60.  The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, provides eligible employees twelve work weeks of leave for, *inter alia*, a "serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  At the time that plaintiff attempted to return to work after suffering a pulmonary embolism, she was eligible to request leave under that Act.

[22] Doc. no. 57-3 (Captain Berzett Deposition), at 160.

[23] *Id.* at 161.

[24] Doc. no. 57-1 (Plaintiff's Deposition), at 54-55.

"begged for her job," because her daughter had just been accepted to the University

of Alabama in Birmingham.[25]

The one fact that is not disputed is the text of the letter given to plaintiff by

Administrative Supervisor Sullivan following the June 29th meeting:  *i.e.*,

To whom it may concern,

> Due to Doctor's orders Ms. Tammy Staten can no longer be around inmates.  This is a primary duty with the Morgan County Jail. We have no kind of light duty available.  And because of this, we are no longer able to employ Ms. Staten at this time.  Ms. Staten has been a good employee and left in good standing.

Doc. no. 57-4 (Exhibit to Deposition of Charlene Sullivan).  Plaintiff construed that

letter as stating that her employment had been terminated.  Even so, neither Captain

Berzett nor Administrative Supervisor Sullivan possessed the authority to terminate

employees — only Sheriff Franklin could do that.[26]

Plaintiff left the Jail after receiving the letter from Ms. Sullivan.  She filed for

unemployment benefits, but her application was denied.[27]  The unemployment records

indicate that plaintiff "quit" her employment:[28]  *i.e.*, the "Morgan County Commission

Personnel  Action  Request"  states,  in  the  section  labeled  "Termination  of

---

[25] *Id*. at 56-57.

[26] Doc. no. 57-3 (Captain Berzett Deposition), at 164.

[27] Doc. no. 57-4 (Charlene Sullivan Deposition), at 61.

[28] Exhibit to doc. no. 57-5 (Brent Langley Deposition) (Records of the State of Alabama Department of Labor, Unemployment Compensation Division).

Employment," that "Ms. Staten has resigned due to medical conditions."[29]  The

Morgan County Commission — the entity responsible for completing the former

employer's portion of unemployment compensation claims — opposed her

application for benefits, apparently without consulting Ms. Sullivan.[30]

## II.  DISCUSSION

Sheriff Puckett initially argued that summary judgment should be entered in his

favor on plaintiff's *Rehabilitation Act claim*.[31]  That contention is inexplicable,

because this court had previously dismissed the claim, with prejudice, when ruling

upon defendant's motion to dismiss plaintiff's third amended complaint.[32]

Plaintiff also observed that, in making such an argument, defendant had "failed

to affirmatively move for judgment on the pending ADA claim" as required by

Federal Rule of Civil Procedure 56(a),[33] providing that a party's motion for summary

judgment should identify "each claim or defense . . . on which summary judgment is

---

[29] Doc. no. 62-3 (Exhibit 14 to Captain Berzett Deposition), at ECF 11.

[30] Doc. no. 57-4 (Charlene Sullivan Deposition), at 61.

[31] Doc. no. 56 (Defendant's Brief in Support of Summary Judgment), at 21-30.  Defendant argued that plaintiff had not shown that defendant was a recipient of federal funds, as required by § 504 of the Rehabilitation Act, and also that she did not produce evidence that she was a "qualified individual," because  she was medically restricted from interaction with inmates for six months.  *Id.*

[32] *See* doc. no. 31 (Memorandum Opinion and Order), at 3 ("Plaintiff concedes that the claim brought under the Rehabilitation Act (Count II) is outside the statute of limitations and, thus, is due to be dismissed."); *see also id.* at 9 (dismissing claim with prejudice).

[33] Doc. no. 61 (Plaintiff's Brief in Opposition to Summary Judgment), at 23 n.6.

sought."[34]   However, plaintiff also addressed the elements of an ADA claim, and

argued that:  interaction with inmates was not necessarily an essential function of a

Detention Deputy; and, that other Jail employees with medical restrictions had been

assigned to posts with minimal inmate contact.[35]   Those arguments opened the door

for defendant to address plaintiff's ADA claim in his reply.  He focused upon the

similarity of the legal standards for ADA and Rehabilitation Act claims,[36] and argued

that plaintiff had waived her claim for prospective, equitable relief under the ADA

by rejecting Sheriff Puckett's offer of reinstatement.[37]   Thus, while the court is not

required to address the merits of a claim on which summary judgment has not been

explicitly sought, the court will do so for reasons of judicial economy.

## A.    Plaintiff's ADA Claim

Plaintiff concedes that *retrospective* monetary damages for violations of the

ADA by state governmental officials, like defendant, are barred by the Eleventh

Amendment.[38]  *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S.

---

[34] *See* doc. no. 34 (Fourth Amended Complaint); doc. no. 55 (Motion for Summary Judgment); and doc. no. 56 (Defendant's Brief in Support of Summary Judgment).

[35] Doc. no. 61 (Plaintiff's Brief in Opposition to Summary Judgment), at 24-32 (*e.g.*, pod tower command, master control, booking, or medical unit).

[36] Doc. no. 66 (Defendant's Reply Brief in Support of Summary Judgment), at 2.

[37] *Id.*

[38] *See* doc. no. 22 (Plaintiff's Response to Defendant's Motion to Dismiss Third Amended Complaint), at 15.

356, 360 (2001).  Nevertheless, she contends that she can still recover *prospective*

relief, such as reinstatement or "front pay."  While that may be true as a general

proposition, it does not benefit plaintiff because, "once an employer makes a 'good

faith' offer of reinstatement, 'claimants forfeit their right to reinstatement unless their

refusal of the employer's offer is reasonable.'"  *Lewis v. Federal Prison Industries,*

*Inc.*, 953 F.2d 1277, 1279 (11th Cir. 1992) (quoting *Stanfield v. Answering Service,*

*Inc.*, 867 F.2d 1290, 1296 (11th Cir. 1989)).

Courts have recognized that a plaintiff's rejection of an employer's good faith

offer of reinstatement may be reasonable in such circumstances as:  (1) when

reinstatement would cause the plaintiff to suffer a mental or physical illness;[39] (2)

when discord or antagonism exists between a plaintiff and her employer;[40] (3) when

the defendant's managerial employees "intimidated or threatened" plaintiff, *and*, the

evidence indicated that plaintiff's "self worth was crushed by [her] dismissal";[41] and

---

[39] *See Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277, 1280 (11th Cir. 1992) (observing that a psychiatrist treating the plaintiff had testified that "Lewis experienced a 'reactive' depression in response to the discriminatory acts that occurred at [the Federal Correctional Institution in Tallahassee ("FCI")]," and that even though plaintiff's "health had improved since he left FCI, his symptoms would return should he return there") (alteration supplied).

[40] *Id.* ("Many courts, including this one, have noted that '[f]ront pay may be particularly appropriate in lieu of reinstatement where discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy.'") (quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1449 (11th Cir. 1985)); *see also E.E.O.C. v. Prudential Federal Savings and Loan Ass'n*, 763 F.2d 1166, 1172 (10th Cir. 1985); *Dickerson v. Deluxe Check Printers, Inc.*, 703 F.2d 276, 281 (8th Cir. 1983).

[41] *Lewis*, 953 F.2d at 1280 (quoting *Eivins v. Adventist Health System*, 660 F. Supp. 1255, 1263 (D. Kan. 1987)).

(4) when plaintiff has a fast-approaching retirement date, "and the time period for which front pay [would be] awarded is relatively short."[42]

Here, however, plaintiff's stated reason for rejecting Sheriff Puckett's offer of reinstatement — she "just would feel unsafe" in returning to the Jail — does not fit any of the foregoing circumstances that courts have traditionally considered when determining whether rejection of an offer of reinstatement is reasonable:

Q.     [Y]ou don't want to go back to work as a detention deputy, do you?

A.     No, sir.

Q.     When did you decide that you weren't going to go back to work there?

A.     I just — I been decided I don't want to go back to work there because it's just — no.  It's just too much to handle.  I couldn't.  Huh-uh.  I couldn't do it, just going back up there.

Q.     Why not?

A.     It's just safety.  Safety, you know, it's different than working — safety-wise, it's different than working at, okay, I got a lawsuit.  It's different working at a daycare than working at going back to the prison.  You know what I'm saying?  It would be a difference.

Q.     You would feel unsafe?

A.     I just would feel unsafe. If I went.

---

[42] *Id.* (quoting *Eivins*, 660 F. Supp. at 1264 ("The plaintiff is 57 years old and nearing the usual age of retirement.  Because the time period for which front pay is being awarded is relatively short, reinstatement may be inappropriate.")).

Q.   Why would you feel unsafe?

A.   I just would feel unsafe.

Q.   All right.  And would that have been your feeling from the moment you got terminated on June 29th through today, you would have felt unsafe?

A.   If he hadn't terminated me and I had to take some time off, I wouldn't have felt unsafe.  But since the fact that he terminated me, yes.

Q.   So as of June 29th, 2016, you had decided you weren't going to to go back to work there?

     * * * *

A.   I mean, why would I?  He [Captain Berzett] terminated me, so why would I?  Why would I even try if he's up there — Okay.  In six months he's up there, you try to go back.

Q.   All right.  And we know he's [Captain Berzett] not up there. Would you —

A.   Yeah, two years out.  Two or three years out.  That Ron Puckett —

Q.   Okay.  Still don't want to go back to —

A.   No, I don't want to go back.

Q.   When did you decide you weren't going to go back to work there?

A.   When Ron Puckett asked.

Q.   All right.  Have you ever been willing to go back to work at the jail?

A.      I don't want to go back to the jail.

Doc. no.  57-1 (Plaintiff's Deposition), at 114-17; *see also id.* at 117-18.

If plaintiff had accepted Sheriff Puckett's offer of reinstatement, she would have served under a different Sheriff, who played no part in the events leading to her departure from county employment.  Further, Captain Berzett, the person whom plaintiff blamed for "firing" her, resigned during January of  2019, before Ron Puckett became Sheriff.  Therefore, there should have been no concerns of discord or lingering antagonism.  There also is no evidence that plaintiff would have suffered a physical or mental illness, if she had accepted the offer of reinstatement.[43]

In short, no evidence supports plaintiff's contention that her rejection of Sheriff Puckett's offer of reinstatement was reasonable.  Accordingly, she waived her claim to *prospective* relief, such as reinstatement or front pay, and summary judgment will be entered in defendant's favor on plaintiff's ADA claim.

**B.     Title VII Claim**

Plaintiff has not pointed to any direct evidence indicating *either* (1) that the discussions which occurred during the June 29, 2016 meeting with Captain Berzett, Sergeant Moats, and Administrative Supervisor Sullivan, *or* (2) that Sheriff Franklin's standing policy prohibiting Detention Deputies from working in the Jail

---

[43] Plaintiff testified that she was physically able to return to work.  Doc. no. 57-1 (Plaintiff's Deposition), at 118.

while subject to physician-imposed restrictions, was motivated by a discriminatory animus based upon her race, African-American.  Even so, she contends that circumstantial evidence supports her Title VII claim.  That requires plaintiff to satisfy the standards first announced by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under that now-familiar, burden-shifting framework, a plaintiff bears the initial burden of establishing a *prima facie* case, which requires her to show that:  (1) she is a member of a protected class; (2) she was qualified to perform the duties of her former position; (3) she was terminated (an adverse employment action); and (4) she received less favorable treatment than a similarly situated person outside her protected class.  *See, e.g., Flowers v. Troup County, Georgia, School District*, 803 F.3d 1327, 1336 (11th Cir. 2015).

If a plaintiff satisfies all elements of a *prima facie* case, the defendant then must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *See, e.g., Gogel v. Kia Motors Manufacturing of Georgia, Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (*en banc*).  That burden is exceedingly light:  the defendant must simply proffer a nondiscriminatory reason, not prove the reason.  *See, e.g., Meeks v. Computer Associates International*, 15 F.3d 1013, 1019 (11th Cir.

14

1994).

If a defendant meets its burden, the plaintiff then must prove by a preponderance of the evidence that the defendant's stated explanation is pretext for unlawful discrimination.  *See, e.g.*, *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001); *Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 832 (11th Cir. 2013) (*per curiam*).

Here, plaintiff's Title VII claim fails at the first step of the *McDonnell Douglas* framework.  Even assuming for the sake of discussion that she could satisfy the first three elements of a *prima facie* case, she has no evidence showing that she was treated less favorably than anyone outside her protected class.

Under Eleventh Circuit precedent, a plaintiff and her comparator(s) "must be 'similarly situated in all material respects,' meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'" *Butts v. CentiMark Roofing Corporation*, 2022 WL 950938, at \*2 (11th Cir. Mar. 30, 2022) (*per curiam*) (quoting *Lewis v.  City of Union City*, 918 F.3d 1213, 1229 (11th Cir. 2019) (*en banc*).

Plaintiff identifies Lieutenant Kelso, Officer Free, and work-release supervisor John Wright as possible comparators.[44]  However, those employees are not valid

---

[44] Doc. no. 61 (Plaintiff's Brief in Opposition to Summary Judgment), at 3-5.

comparators because, among other considerations, their physical limitations occurred *after* Sheriff Puckett had rescinded Sheriff Franklin's "zero tolerance" policy.[45] Moreover, Officers Matt Hokett, Sarah Chavers, and Teresa Cox, who were employed during Sheriff Franklin's tenure, are not valid comparators, because there is no evidence that their restrictions had been imposed by a physician. Plaintiff, therefore, failed to establish a *prima facie* case of race discrimination.

Even assuming that plaintiff could establish a *prima facie* case, her Title VII claim still would not survive summary judgment because she neither pointed to any evidence indicating, nor argued in her responsive brief, that defendant's stated reason for her "discharge" — *i.e.*, that she was medically restricted from contact with inmates for six months — was pretext for discrimination on the basis of her race.

### III.  CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted. An appropriate Final Judgment will be entered contemporaneously herewith.

**DONE** this 31st day of May, 2022.

_____
Senior United States District Judge

---

[45] *See* doc. no. 62-6 (Warden Dawson Deposition), at 50-53.

16